We'll call our second and final case of this afternoon, number 16-3365, United States v. Perez, Mr. Donahue and Mr. Len. Good afternoon, Your Honors, and may I please the Court, Keith Donahue for Appellant Javier Perez. You're welcome. Thank you, Your Honor. If I may, I'd like to reserve three minutes of my time. Sure, again. The Fourth Amendment's prohibition on unreasonable searches sometimes calls for more targeted inspection of digital content than physical places. And the need for that role is particularly striking in this case because what happened is that agents left off with the more targeted inspection they'd been making. At the very point, they began to search digital content on devices seized from multiple residents. The argument you're making here, just as a prelude, you made essentially the same argument in the Townsend case, did you not? Well, I argued for a requirement of minimization in digital searches, but the facts were notably different in that case, in the sense of the procedure that the agents had followed there. Okay, here, you're essentially, you're not attacking the warrant itself, are you? You're attacking the execution of the warrant? That's exactly right. And what was the reason that you wouldn't attack the warrant itself? Well, the warrant, while authorizing a very broad search, which is a notable dimension of the case, did define the limits of that search in terms of the crime under investigation, the possession or distribution of child pornography. And I think the precedent is fairly clear that that suffices, even though it's of unusual breadth. But what the court did say in Stabile is that as the object of the search becomes more general, the procedure by which the search is conducted becomes more important. So there is an interplay in that sense. So what should the government have done? Well, there's no single answer to that question. But what they, in the most general sense, should have done is they should have started in the most obvious places to try to find the evidence they were looking for. There might be a range of such places. The most obvious one would be to use the same technology they've been using to pinpoint the residents in order to pinpoint the device. This is the hash value technology discussed in the briefing. Did you argue that in the district court? We argued that they had to start in the most obvious places first. We didn't put forward hash value technology in particular. And our argument on appeal doesn't rise and fall with hash value technology. There are many other things agents might have done. One simple one, they might have looked to see if a device had on it what was called an ARIES software, software for this peer-to-peer network. If it didn't, that would be some indication it wasn't the device they were looking for. Yeah, but for us, you argued in your opening brief that the hash value is where they should have started. But you backed off that in your reply brief. And specifically, the government says, well, tell us what we should have done differently. And you never gave an answer as to what the proper definition of how they should have conducted the search in order to be within the parameters of the search warrant. You never indicated how they should limit the search. Right. Are you backing off the hash value opening brief? In the sense that I agree it's not the only thing they could have done. I do believe it's the most obvious thing. And our principle is they have to start in the most obvious places. Well, why do they have to start in the most obvious places as long as where they started is within the parameters of the search warrant? They have to start in the most obvious place because digital content is a special category under the Fourth Amendment. This is extremely private content. It's equally or more private than things like personal papers and wiretapping communications. And in these cherished domains of privacy, the Fourth Amendment contemplates that searches have to proceed in a manner that's calculated to minimize unnecessary intrusion. Yeah, but you're differentiating a computer search from an ordinary search where as long as what the officers do is within the parameters of the search, it's constitutional, even though they should have started somewhere else. I mean, that argument's been made in, you know, ordinary everyday searches of houses. As long as what they've done is within the parameters of the search, even though they should have done something more obvious some other place in the house that they searched, as long as it's within the parameters of the warrant. And specifically going with this computer search, you haven't indicated how they could have done it differently so that it would be within the search warrant. Other than the hash value, which you, as I read your reply brief, you sort of backed off on the reply brief after they made that point in their answer brief. Right. Let me quickly, from the beginning of your question, I absolutely am taking the position that digital searches are different from physical locations. I don't dispute your Honor's point that they could start anywhere within the parameters of a warrant when searching a house. Computers are different. That's evident in this appeal. In other words, there's a special rule for computers that, unlike ordinary searches, they must proceed differently, even though the way they're proceeding is within the parameters of the search warrant. Is that what you're saying? Yes, they must start, you know, the precept I'm urging, in as many words, is they must start in the most obvious places, and if and when it becomes necessary, move to less likely or more obscure ones. So what should they have done here? There are many places they might have started. What is evident were not among those places are the ones where they did. They started right in the Internet history, which is some of the most private information on a machine, and which they had no, which was the least likely place they were going to find the evidence for which they had probable cause. But you conceded that was within the scope of the warrant. You opened by arguing that the warrant, or telling us that the warrant was very broad in nature, the authorizing warrant, right? So are you arguing the government exceeded the scope of the warrant, or you just didn't like where they started? Did they exceed the scope of the warrant? No. Our challenge is to the method of execution, and the nature of that challenge is premised on a requirement under the Fourth Amendment that searches of digital content be more focused than searches for other physical items. So I don't know that... So you don't like the way they did it. In other words, you think that the way they went about it violated the Fourth Amendment because they had the computer-generated search of the entire body of evidence? No. I'm not objecting to the fact that they ran an overall computer scan. So that's okay? Yes, that's okay. In fact, what I'm saying they should have done, again, is not necessarily their only option, but the most obvious would have been using that same utility, which it's undisputed that utility has this capability. They should have immediately searched, does this device have the videos we're looking for on it? That's not the end of the matter. I'm not saying things end there. I'm saying that's where they start, because if you do that and you find that a computer doesn't have those videos on there, then you might start to have some questions about whether you've got the right computer. There were ten computers seized from three different residents in this residence. So it stood to reason they were quite confident not every one of these devices was going to be within the scope of their probable cause showing. It's to protect the extremely private digital content on laptops and smartphones of innocent people that this rule is essential, because otherwise if they can just dive in and look wherever conceivably they could find evidence, they're going to rummage unnecessarily, without any need, through material that's extremely private. You know, counsel, I agree with you to this extent. If I were the agent making the search, I think I would start where it's most obvious that I would find this material. But as we've indicated, I think that would be a lazy way of doing it. I would do it the easiest way I could and find information. But in what way they proceeded here, which was not going the most obvious way, is it contrary to the law of the circuit side by side? What did they do? It's contrary to the termination error, which is the same type of search in this situation. Right. I think there are notable distinctions with Stabile. But what they didn't do, what's contrary to Stabile, Stabile said searches of digital content have to be tailored. Judge Boies read Stabile for that proposition in his opinion below. I thought in Stabile we acknowledged that we have declined to prescribe any rigid procedure for conducting a search as, quote, it is clear that because criminals can and often do hide, mislabel, or manipulate files to conceal criminal activity, a broad, expansive search of the hard drive may be required. Yes, Stabile did say that. So, I mean, if this were the Tenth Circuit, you might, there's a couple of cases there that indicate that maybe there are some protocols you should start with the most obvious first. But because there is the ability, or quite often, the mislabeling or attempt to hide on a computer where something might be that the government is looking for, to say that they have to do the most obvious place first and skip the rest, it still sounds to me like what you're really saying is this was an over-broad search, but only in terms of the execution. Yes, Your Honor, only in terms of the execution. That is the challenge. So remember, Stabile, weren't they going and looking for financial records? And then they came up with information relating to pornography. Right, and in particular, they came to the information concerning pornography when they were looking for a program the detective knew was used to create counterfeit checks when they were investigating a counterfeit check operation. So that was one of the most obvious places. Let me emphasize the plural there. It's most obvious places. I'm not saying there's one obvious place, and that's why I'm not proposing a protocol of the kind that Stabile quite rightly said it would be impossible for courts to adopt in advance. This language from the Tenth Circuit, the most obvious places, it's not a protocol. It's a precept. So if they went to the most obvious place first and didn't find anything, are they done? Or can they go look elsewhere? They can keep looking. As long as they're in the scope of the search warrant. And as long as they're proceeding in a fashion that is tailored, that they're continuing to look in less and less obvious places, but not immediately jumping around the machine. They can search from the most obvious to the more general, as long as they're within the scope of the search warrant. That's your position, right? As opposed to the government going, from your perspective, from the more general to the more specific. Right, or in this case deciding, hey, we'd like to look at Internet history. That would be interesting. Our position is, as Your Honor stated it, you start in the most obvious, you can spread out, and I'm not telling the agents where they have to stop. You agree that they can spread out as long as they're within the confines of the search warrant? As long as they're using a minimization technique of looking in the most obvious places and only looking in less likely ones as it becomes necessary. Didn't we reject that in Townsend, the Townsend case? We rejected that. We rejected your entire hash value argument. As a matter of fact, the Townsend case is the effect that, as long as it's within the scope of the warrant, it's not unconstitutional. To some extent. Well, isn't that what Townsend says? I don't believe so, Your Honor. I think what Townsend said is quite fact-specific. What happened in Townsend is that one of the very first devices the detectives looked at was a thumb drive, put it in, 4,500 images of child pornography pop up like that. And it's our position that once they discover an image of child pornography, they're off to the races. My role ends there. It's obvious they're obscure until you discover an image of child pornography. It might be different in different cases, but that's what it is in this case. So in Townsend, I mean, the facts were such that the court, reasonably enough, I confess, after the fact, said, no, this was tailored. They used the term minimize. Townsend uses the term minimize to describe what the agents did. It says it was reasonably calculated to turn up the evidence for which they had a warrant without intruding unnecessarily. So it was fact-specific, and to some degree I regarded it as adopting the precept I was urging but applying it against me. Thank you, Your Honor. Mr. Glenn. May it please the Court. Albert Glenn for the United States. The touchstone of Fourth Amendment law here in evaluating these searches is reasonableness, and that takes into account all of the circumstances involved in the case. And here, the way the agents conducted this search was reasonable. I'd like to address how they conducted the search, because I think there's a little bit of a misapprehension about that. The case agent testified at the suppression hearing, as did the forensic examiner. The first thing that happened was an image was made of the hard drive, and then the FTK software was used to catalog all of that. Counsel today said he has no issue with that. And then the case agent requested specific items that they wanted to look at. And it wasn't just Internet history that counsel refers to. They asked for CVIP. CVIP is known child pornography images, which is searched for by hash values. They did that here. That was one of the very first things they did. The agents also asked for graphic images, which are still images, video files, and, yes, Internet history and e-mails with attachments. And then from the large volume and quantity of documents which are on this hard drive, the forensic examiner extracted just those items, just what was asked for, and gave that to the agent to examine. Agent Schreier then testified how he examined them. He examined the still images to see if there were images of child pornography. A logical place to look, a good place to start. It's a child pornography investigation. Look for child pornography. And he would look at these little thumbnails, which are very small, and see if there was any indication that one of them might have child pornography. If there was some indication, he would click on that one and look at it in detail. But if there wasn't such an indication, he would pass right over it and move on. Well, isn't he making a general search, though? I mean, you know, let's face it. The graphic files, videos, e-mails, Internet history, this is a general search. This is not a specific search for child pornography. He's looking at everything on the computer, every single thing. These are things that you wouldn't, if you were hiding it, I think, if you were involved in this, you couldn't put it on that. I think, you know, his position is you had a general search, and it seemed to me you exhausted the entire area in the search. The agent was looking in places where what he was entitled to look for could be found. What he was entitled to look for included still images of child pornography and video images of child pornography. Those can be found in video files. The software has the ability to extract video files from the computer, and without looking at a video file in some way or a graphic file in some way, you don't know if it is or isn't child pornography. Let me put it the other way. What could he look at in this search that he had in the computer here? What could he not look at as being outside the warrant? Or is it your position that it's open sesame? Anything and everything goes when the whistle blows? Let me answer that in two ways. Number one, he can look anywhere on the computer where what he was entitled to see might be found, and because of the way that… We agree with that. The question is not that. The question is what could he look at on this computer? You tell me. He could look where things could be. He could look where he could find the things he sees. Oh, no. I didn't answer that. Yes. Listen to my question, sir. Yes, sir. What could he not look at on this computer, which would have been beyond the bounds of… You acknowledge that the search warrant is not a general search warrant, right? Correct. Okay. What could he not look at on this computer under the search warrant? He could not look at a file longer than it would take to determine whether it was something seizable or not. But he could look at the file. He could look at the file. Every file. He could because… Everything on the computer. Every single thing. Yes, and that is because… Okay. Your position is there's no bounds to what he could not look at. That is because what he was entitled to see could be in any file on the computer. There's testimony at the suppression hearing, and Stabile recognizes itself that subjects can change file names, can do things to hide images. And it's not just images. There's other evidence of child pornography which was entitled to be seized under the warrant. It's like a general search warrant to me. Not at all, Your Honor. It's because of the limitation on the way the search is conducted, the reasonable way it was conducted, and that is that the agent would only look at a file to the extent necessary to see if something seizable was there. But second, I would say in this case, Your Honor, he did not look at all the files on the computer. Far fewer than that. There were only very specific files which were requested and provided to the case agent. Pictures, movies, Internet history, and some e-mails. There were no spreadsheets. There were no Word documents. There were no… How long did this search take? Agent Schreier testified at the time of suppression hearing he had spent four hours looking on it. Now, Agent Manning previously had spent time doing the search as well. She wasn't available for the suppression hearing. But it was four hours for Agent Schreier and some time for Agent Manning. So this is the government's position that nothing was off limits, but we only looked where we thought we would find child pornography. That's true, and that was much less than all that was on the computer. Is that because the government specifically looked for videos and photographs as opposed to anything else? Did they confine their search to videos and photographs? I'm sorry, Your Honor? Was the search confined to videos and photographs? It was confined. What was actually requested and provided to the agent were videos, photographs, Internet artifacts, e-mails with attachments in the first group. I think that was roughly it. And then there was a second request for certain information related to the ARIES software, the ARIES software search terms, downloads, partial downloads, log files related to the ARIES software, which is really much more specific. At the hearing was it established as a fact that what was looked at on this particular computer pursuant to the warrant was much less than what was actually on the computer? Yes, Your Honor, very much less. Computers, of course, can hold enormous amounts of data, and there was testimony that it would be impossible to look at everything on the computer. So it was very focused. But what was requested from the forensic examiner and given to the agent was a very filtered small part of all that was on the computer, just where it seemed most likely that the items which were called for in the search warrant could be found. So, yes, very limited in that sense. So in this sense it was a reasonable search. Stabile, in other cases, recognized that because of the way these are organized and what people can do you might have to look at many files on the computer, maybe all the files on the computer. That didn't happen here. It wasn't anything close to all the files on the computer. What is your response to your adversary that you should have started with hash values  Two responses, Your Honor. The first is they did. In the testimony of the forensic examiner, one of the things requested was CBIP hits, so known child pornography images. That was run. That was provided to the case agent. So that was done initially. And secondly, in response to counsel, the agents are the ones who need to be in a position to determine in their discretion what is going to be the most effective way to do a search. And that's why a number of cases have issued the concept that there should be specific search protocols dictated for agents as a matter of Fourth Amendment law. That's not appropriate to be done. It's also not appropriate in a technological area like this where today it may be hash values are a good place to start, but next month technology moves on and something else might be a better place to start. So what if any limitations would make sense? The reasonableness standard that's set out by the Supreme Court and that we follow in all of these. It looks on a case-by-case basis as to how this search was conducted. It's a reasonableness standard, which should be applied here, and that's what makes sense, yes. I would also note that we do believe that a lot of the arguments they've raised here on appeal were not raised in the district court. The district court looked at two questions, really. One was the argument that they shouldn't have run these forensic software on the entire computer, looking at part of the search protocol from the search warrant, but complaining about that. And the second was an argument that they were rummaging through the computer. There were no discussions in the suppression hearing or in the district court's opinion about what to prioritize and how you go forward with the search. So we suggest some of the arguments they've made here really were raised, and we would have put some other information on the record had we known that at the time. We would have talked about the CVIP search and what did they find, and did they find the ones that the agent had originally downloaded or not. We know that one of the files was there, but probably not the same file that the agent downloaded, although because the defendant had downloaded some afterwards, after the agent had downloaded the CVIP. What if we attempted to do what the Tenth Circuit did in Burgess, which is attempt to set some type of parameters or protocols by which the execution of a search warrant should be carried out, so that you don't sweep in a whole lot of private information with regard to something that is very clear. I mean, this is like Potter Stewart said, you know it when you see it, and there's a whole lot of other stuff that's on that computer that would be gone through. So is the Tenth Circuit on the right path, or should we stay away from that? I think you should stay away from that, Your Honor, if it's trying to dictate specific ways to do it. The more general statements, for example, that the warrant should be executed in a way to minimize the invasion on privacy interests, is absolutely correct, and that's been said. The Supreme Court said that in Anderson, and that's something that the court will consider in evaluating the reasonableness of a search. But in addition, in terms of the way they go about it, as a practical matter, part of the way that these warrants should be executed, as was done here, is that the files that are looked at should be looked at only to the extent necessary to determine if they contain something seizable under the warrant or not. And that is really a minimization take. That's important. If the agent here were to open a file and it's a tax return, there would be no reason for him to go beyond the sign that says 1040 on it and read 10 pages of tax return. That would be inappropriate. That would be unreasonable. That would not be appropriate under this warrant. But to open it and see that it's a tax return and go on, is an appropriate way to execute the search warrant here in this case. I would suggest, Your Honor, that the district court's finding of facts here is well supported. When the district court, in its opinion, said the record is devoid of evidence that at any point the government searched for evidence other than that which was authorized pursuant to the terms of the warrant. That's what the district court found. We believe that's well supported, and the district court's finding of reasonableness is appropriate here. Thank you very much. Thank you, Your Honor. Mr. Donohue. Judge Amber, the fullest testimony about the length of time these searches take is at pages 92 and 107 of the appendix. The flavor of it is weeks. Judge Rusceppo, I think you heard. Their limiting principle is trust us. Trust our subjective intent. We're going to only look for what we're supposed to look for. You know, I don't disagree. I believe they were looking for child pornography, but that's not enough. What about the fact that they didn't look at every file? So they did make an effort to minimize, as it were. You don't have to look at every file on a computer to come across very private information. So, you know, counsel for the government is he spoke again and again. They're looking at photos. They're looking at videos. They're also looking at is Internet history. You don't have to look at that history very long to see, oh, this user was researching treatment for depression. I won't look more. I won't type of treatment. This person was looking at abortion providers. I won't figure out which providers it was. You know, this person is in some kind of financial distress. They're looking for loans, but I'll stop now. I won't figure out what rate loans they want. You know, you scratch the surface like that and you see a lot of private information. It was entirely unnecessary in this case. They had videos that had been obtained over Aries. They had no sign that anyone had used a computer in that household to engage in any unlawful activity over the web by web browsing. And yet they decided that would be some of what they looked at. So the idea that it's just enough for an agent to look away once he's come across innocent content is not respectful of the degree of privacy in digital content and the minimization requirement that should apply there. At one point, counsel said they were looking at areas where items were likely to be found. Well, that's our principle. That's the Tenth Circuit, Burgess decision of setting out at a broad level of generality, start in the obvious places, only go past that when you have to. That protects innocent people's digital content. So I think that's... In effect, what you're saying is that, look, there was probable cause to search this particular computer. They went too far. There aren't any particular guidelines in this circuit because it's such an amorphous area. Tenth Circuit did something very general in terms of trying to start on the way down to look at guidelines. It's tough to do. And is this the case to do it? This is most certainly the case to do it, Your Honor, because in rummaging that Internet history, we know they never found anything. They never found a single item of evidentiary value there that was entirely unnecessary. All they did was study a lot of innocent content. So we do need something like Burgess. It's a broad level of generality. Start in the obvious places. Wouldn't a better case be the flip to what happened... Let's say you were going in for pornography like this case, and you came across financial documents that, with a lot of digging, you might be able to come up with an additional complaint against the defendant. But you have a warrant to search the computer, and you've gone beyond the pictures of pornography to, hmm, this looks kind of funny. Can't figure it out. Maybe I ought to bring a forensic person in to take a look at it. That would be a good case for you. That would be a gross violation of the Fourth Amendment. This is just the opposite. It's a different problem. In that scenario, I think the agents are simply exceeding the outer bounds of the warrant. And I've allowed that they do that. I shouldn't say just the opposite. Here they do go in for pornography. They find pornography. And when they come across private information, it is not used in any way against your client. To me, the most important thing is the sequence. So they find child pornography, and then they come across this financial information. I really don't have much complaint there. If they find child pornography, then it's where it might be appropriate to do what the government says. Then it might be appropriate to say, boy, it could be anywhere on this machine. A user of this machine is consuming child pornography. So, you know, at that point, this idea that agents could have to look anywhere gains more currency. But that's not the situation here. They had ten devices from three residents, and not all of them could be the devices they were looking for. That's why they have to minimize to avoid intruding. I see my time is up, Governor. Thank you very much. Thank you to both counsel. Very well presented arguments. We'll take the matter under advisement.